IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-2821-WJM-GPG

KRIS MARTIN,

    Plaintiff,

v.

UNION PACIFIC RAILROAD CO.,

    Defendant.

# ORDER DENYING DEFENDANT'S SUMMARY JUDGMENT MOTION

Plaintiff Kris Martin ("Martin") sues his former employer, Defendant Union Pacific Railroad Company ("Union Pacific"), for alleged disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. He specifically contends that he could perform all of the necessary duties of his job in the railyard with the reasonable accommodation of knee braces, but Union Pacific allegedly refused this accommodation.

Before the Court is Union Pacific's Motion for Summary Judgment. (ECF No. 35.) Martin filed a response. (ECF No. 39.) Curiously, Union Pacific filed no reply—meaning, among other things, Martin's "Statement of Additional Disputed Facts" stands unrebutted for summary judgment purposes. *See* WJM Revised Practice Standards III.E.5 & .6(b). For the reasons explained below, Union Pacific's motion is denied.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

**II. FACTS**

The following facts are undisputed for purposes of Union Pacific's motion unless attributed to a party or a witness, or otherwise noted.

Union Pacific hired Martin in December 2003. (ECF No. 35 at 5, ¶ 1.)[1] By April 2011, Martin was working for Union Pacific "as a Switchman in the Union Pacific Yard in Grand Junction." (*Id.*) The essential job functions of a switchman are as follows:

- Get on and off stationary equipment;
- Couple and uncouple air hoses and electrical connections between cars and/or locomotives;

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in documents with prefatory material such as a table of contents.

2

- Ride on moving cars by holding on to grab irons and standing on ladder steps;

- Push/pull and lift/carry up to 25 pounds (frequently); 50 pounds (occasionally); and move weights up to 84–87 pounds (rarely);

- Ability to maintain [3]-point contact (both feet and one hand or both hands and one foot) when holding on to the ladder or car;

- Must have balance and coordination to climb ladders and stairs;

- Must be able to maintain balance and coordination while climbing on ladders 12 feet or more and the stairs (occasionally);

- Walk on ballast [*i.e.*, the crushed stone underlying railroad ties and tracks] and ground (frequently);

- Working 12 feet or more above ground (occasionally).

(*Id.* at 6, ¶ 8.)

Martin has arthritis in his knees that "substantially limit[s]" his ability to walk absent an assistive device such as a cane or knee braces. (ECF No. 39 at 5, ¶ 21.) Before he began wearing knee braces in mid-2011 (discussed below), Martin used a "brake stick" both to avoid climbing onto train cars, and as an improvised cane. (*Id.*) A brake stick is a telescoping metal pole that allows the operator to turn train car brake wheels without climbing onto the train car. (ECF No. 35 at 11, ¶ 25.) Union Pacific encourages its employees to use brake sticks because they mostly eliminate the need to climb ladders, and thus the risk of falling from a ladder. (ECF No. 39 at 10–11, ¶¶ 20–24.)

On January 18, 2011, Martin's appendix ruptured while he was off-duty. (ECF No. 35 at 7, ¶ 10.) Martin took a medical leave of absence to recover. (*Id.*) He says he

3

returned to light duty in late February 2011. (ECF No. 39 at 3, ¶ 10.) On February 23, 2011, an unknown manager for Union Pacific referred Martin for a fitness-for-duty ("FFD") review. (*Id.* at 8, ¶ 8.) The FFD examination took place on approximately March 11, 2011, and was performed by Union Pacific's associate medical director, Dr. Soo Hoo. (*Id.* ¶ 9.) Dr. Hoo declared Martin "medically cleared." (*Id.*)

Two or three weeks later, Martin noticed that certain managers and coworkers were observing him very closely. (*Id.* at 9, ¶ 10.) Among these alleged observers were Bill Malloy, the Grand Junction director of terminal operations, and Jeff Gird, an operations manager. (*Id.* ¶¶ 10–11; ECF No. 35 at 5–6, ¶¶ 2, 6.) Gird and Martin had known each other for many years. (ECF No. 39 at 7, ¶¶ 1–2.) Gird had long observed that Martin had difficulty walking and Gird was therefore surprised when Union Pacific hired Martin and Martin passed Union Pacific's initial medical screening. (*Id.* at 7–8, ¶¶ 3–4.)

In late March or early April 2011, Malloy and Gird conferred regarding Martin and decided to send him to a second FFD review. (*Id.* at 9, ¶ 11.) A different physician, "Associate Medical Director Charbonneau," performed that FFD on April 12, 2011, and noted with apparent exasperation that Martin had already passed an FFD the previous month. (*Id.* ¶ 14.) Dr. Charbonneau stated that if anyone had "continuing concerns," a functional safety evaluation ("FSE") should be arranged. (*Id.*) "A FSE is a field test where the employee performs the essential job functions . . . while being observed by his indirect supervisors and a member of [Union Pacific's] medical staff." (ECF No. 35 at 4.) Defendants scheduled the FSE for August 16, 2011, but it was canceled due to Martin's elevated blood pressure on that date. (*Id.* at 8, ¶ 14.)

4

Martin's personal physician declared Martin's blood pressure "under control" in the "spring of 2012," so Martin's FSE was rescheduled for May 4, 2012. (*Id.* ¶ 16.) Gird and another manager, Brian Harris, observed, along with a nurse employed by Union Pacific named Janelle Story. (ECF No. 39 at 12, ¶¶ 28–29.)

Union Pacific has no policy against wearing knee braces, either on the job or during an FSE (*id.* at 11, ¶ 26), but Martin claims that Harris prohibited him from wearing knee braces during the FSE (*id.* at 6, ¶ 24; *id.* at 12, ¶ 31). Martin had begun wearing knee braces the previous August, at the latest. (*Id.* at 10, ¶ 19.)

Gird also prohibited use of the brake stick for a portion of the FSE. (*Id.* at 12, ¶ 33; ECF No. 35 at 11, ¶ 25.) Harris and Gird required Martin to climb onto ten train cars to operate the brake wheels manually, which Martin believes was an unrealistic expectation because his normal duties for Union Pacific required him to climb onto a train car only in rare instances when a brake stick could not reach the brake in question. (ECF No. 39 at 13, ¶ 37.) Unfortunately, while descending the ladder on the tenth and last train car, Martin fell backwards and struck his head on a rail. (*Id.* at 13, ¶ 38.)[2] He believes that he would not have fallen if he had been wearing his knee braces. (*Id.* at 12, ¶ 32.)

A physician in Union Pacific's employ, "Dr. Holland," reviewed Martin's medical records and the outcome of the FSE and imposed work restrictions that ruled out all but sedentary labor. (ECF No. 35 at 9, ¶ 18.) Dr. Holland summarized his reasoning as follows:

> [A]t this time [Martin] is not medically cleared to return to work as a Trainman based on: (1) his low level of aerobic

---

[2] Martin does not claim ongoing injury or disability from striking his head on the rail.

conditioning (stamina), (2) his chronic knee problems requiring the use of knee braces for stability, (3) his failure to safely and successfully complete the F[S]E on May 14 [*sic*], 2012, and (4) his use of the prescription pain medicine Tramadol. These medical conditions individually and together prevent the employee from safely carrying out his required job duties . . . .

(ECF No. 35-10 at 3.)

Dr. Holland derived his "low level of aerobic conditioning" conclusion from an August 7, 2012 "monitored treadmill test," the results of which "indicate[d] a low level of aerobic capacity or stamina." (*Id.* at 2.) But Martin says that three physicians who personally examined him in and around this time period declared him fit to perform his normal duties. (ECF No. 39 at 14, ¶¶ 42–43.) In addition, Martin says that Nurse Story checked his vital signs throughout the FSE, and those vital signs showed he was "sufficiently fit to continue." (*Id.* at 12–13, ¶¶ 29, 36.) As for Tramadol, Martin asserts that he has "prior experience getting off [it]," and that a person who has been off Tramadol for forty hours is no longer considered a safety risk on account of the drug. (*Id.* at 15, ¶ 51.)

Following Dr. Holland's assessment, Martin applied for sedentary jobs at the same railyard, but "[n]othing ever came of [these applications]." (*Id.* at 16, ¶ 57.) Union Pacific also provided vocational rehabilitation assistance to Martin, but Martin was dissatisfied with the vocational rehabilitation counselor's efforts because Martin wanted to continue working as a switchman. (ECF No. 35 at 11–12, ¶¶ 26–28.) Martin has since found sporadic employment elsewhere, mostly as a passenger van driver. (*Id.* at 9, ¶ 22.)

## III. ANALYSIS

A "disability" under the ADA is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).

ADA discrimination claims generally follow the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> Under that analysis, a plaintiff carries the burden of raising a genuine issue of material fact on each element of his prima facie case. If plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual.

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (citations omitted).

Here, one could question whether this burden-shifting framework is necessary or appropriate because Dr. Holland imposed restrictions explicitly on account of Martin's knee problems and his desire to wear knee braces. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) ("*McDonnell Douglas*'s burden-shifting framework may be unnecessary and inappropriate where, as here, there is direct evidence of discrimination" (internal quotation marks omitted)). But Dr. Holland also imposed restrictions based on Martin's supposed aerobic capacity and his use of Tramadol. Martin does not claim any disability connected to his aerobic capacity or use of Tramadol, so Union Pacific could still defend its action on those grounds, regardless of Martin's knee condition. Thus, the *McDonnell Douglas* burden-shifting approach

remains appropriate.

**A.      Martin's Prima Facie Case**

The first question under the *McDonnell Douglas* burden-shifting framework is whether Martin has established a prima facie case of discrimination. A plaintiff establishes a prima facie case of discrimination under the ADA by showing: (1) he satisfies one or more prongs of the "disability" definition in 42 U.S.C. § 12102(1), quoted above; (2) he is qualified to perform the essential functions of the job he seeks, with or without reasonable accommodation; and (3) he suffered discrimination as a result of his real or perceived disability. *See Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 742 (10th Cir. 2013).

       1.      <u>Presence of a "Disability," as Defined</u>

The Court turns to the first element of Martin's prima facie case: whether he was actually disabled, had a record of disability, or was regarded as disabled.

           a.      *Actual Disability (42 U.S.C. § 12102(1)(A))*

To prove that he is disabled, Martin must: "(1) have a recognized impairment; (2) identify one or more appropriate major life activities; and (3) show that the impairment substantially limits one or more of those activities." *Sanchez v. Vilsack*, 695 F.3d 1174, 1178 (10th Cir. 2012). The first two steps in this inquiry "are questions of law for the court," and the third "is ordinarily a question of fact for the jury." *Id.* (internal quotation marks omitted).

           (i)      Recognized Impairment

Osteoarthritis in the knees is a recognized impairment. *See* 29 C.F.R. § 1630.2(h)(1) (EEOC interpretive regulation defining "[p]hysical or mental impairment" for ADA purposes to mean "[a]ny physiological disorder or condition . . . affecting one or

more body systems, such as . . . musculoskeletal"); *Marsh v. Terra Int'l (Okla.), Inc.*, 122 F. Supp. 3d 1267, 1278 (N.D. Okla. 2015) (relying on this regulation to conclude that osteoarthritis in the knee is a recognized impairment).

(ii) Major Life Activity

As relevant here, "major life activities include . . . walking[] . . . ." 42 U.S.C. § 12102(2)(A). Martin's osteoarthritis of the knee affects his ability to walk.

(iii) Substantial Limitation

Union Pacific makes no argument that Martin's ability to walk is not substantially limited. Rather, Union Pacific's managers were concerned about Martin precisely because they observed him having difficulty walking.

(iv) Union Pacific's Arguments

Despite the foregoing, Union Pacific argues that this Court should follow the reasoning in *EEOC v. BNSF Railway Co.*, 124 F. Supp. 3d 1136 (D. Kan. 2015), *aff'd*, 853 F.3d 1150 (10th Cir. 2017), and find a lack of actual disability. The Court will refer to this as the *Duty* case because Kent Duty was the prospective employee who experienced the alleged disability discrimination that prompted EEOC to file suit. *See* 124 F. Supp. 3d at 1139.

*Duty* held that the prospective employee had no actual disability because he had adapted to an arm injury such that he had no difficulty in "doing activities that are of central importance to most people's daily lives." *Id.* at 1143–46. Extrapolating from that standard, Union Pacific argues that Martin can still groom himself without assistance, cook, shop, clean his house, and so forth, so he should not be considered disabled. (ECF No. 35 at 14–15.)

*Duty*'s central-to-daily-life test came from *Toyota Motor Manufacturing, Kentucky,*

*Inc. v. Williams*, 534 U.S. 184, 198 (2002), which *Duty* acknowledged to have been statutorily abrogated by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553. *See Duty*, 124 F. Supp. 3d at 1143. But "[b]ecause the allegedly discriminatory conduct [at issue] took place before those amendments, and because the amendments are not retroactive, the parties agree that the court must resolve the 'disability' issue by applying the law as it stood prior to the amendments." *Id*. n.3. Thus, by its own terms, *Duty*'s analysis is not appropriate here, where the alleged discriminatory conduct took place long after the ADAAA took effect and abrogated the central-to-daily-life test.[3]

The above analysis of impairment, major life activity, and substantial limitation comports with the ADAAA's intentionally more liberal definition of "disability." *See Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 545 n.16 (10th Cir. 2014) ("The [ADAAA] created a broader definition of disability to protect more individuals, by, inter alia, expanding what is considered a major life activity and directing courts to interpret 'substantial limitation' broadly in favor of coverage."); *see also* Pub. L. No. 110-325, § 2(b)(5) ("it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations[;] . . . the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis"); 29 C.F.R. § 1630.2(j)(ii) ("An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the

---

[3] In all events, walking seems central to daily life under any standard.

10

individual from performing a major life activity in order to be considered substantially limiting."). Martin, accordingly, is disabled within the meaning of 42 U.S.C. § 12102(1)(A).

    b. *Record of Disability (42 U.S.C. § 12102(1)(B))*

In most cases, if an individual has a persisting impairment that qualifies as a disability under § 12102(1)(A), and if that impairment has been documented or is otherwise known to others, then the individual will also have a "record" of such impairment under § 12102(1)(B). *See* 29 C.F.R. § 1630.2(k). There is no dispute here that Martin's knee condition has been documented and was otherwise known to his employer. Martin is thus disabled under § 12102(1)(B).

    c. *Regarded as Disabled (42 U.S.C. § 12102(1)(C))*

An individual is disabled under § 12102(1)(C)'s "regarded as" prong "if the individual is subjected to a prohibited action [*e.g.*, firing, demotion] because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." 29 C.F.R. § 1630.2(*l*)(1).

Martin's evidence is enough for a reasonable jury to conclude that Union Pacific regarded Martin as disabled. Martin's superiors essentially admit as much given their concern about his ability to walk, and Union Pacific adopted Dr. Holland's restrictions that were based on, among other things, a belief that Martin's "chronic knee problems" prevented him from performing his desired job. (ECF No. 35-10 at 3.) Summary judgment is therefore inappropriate on Martin's "regarded as" theory.[4]

---

  [4] Union Pacific's attack on this theory again relies on pre-ADAAA standards that the ADAAA abrogated. (*See* ECF No. 35 at 15–17.)

2. Qualified to Perform Essential Functions

The next element of Martin's prima facie case is whether he was qualified to perform the essential functions of the switchman job, with or without reasonable accommodation. Union Pacific argues that Martin cannot perform the essential function of climbing train cars, as primarily evidenced by the fact that he fell during his FSE while climbing down from a train car. But Martin claims: (a) the FSE involved much more climbing than a switchman normally must perform; and (b) he fell because he was not permitted to use his knee braces. Martin has presented competent evidence to support these claims and his position is within what a reasonable jury could accept.

Moreover, as to Dr. Holland's claim that Martin was not sufficiently fit for the job, aerobically speaking, Martin has presented contrary evidence in the form of (at least) the following: he performed the job from 2003 through 2011; other doctors have found him fit to work; and the vital signs Nurse Story recorded during the FSE were acceptable.

Finally, Union Pacific's Rule 30(b)(6) deponent agreed with Martin that knee braces and a brake stick could be a reasonable accommodation. (ECF No. 39 at 11, ¶ 26.)

In sum, there is a genuine dispute of material fact regarding whether Martin was qualified to perform the essential functions of a switchman. Summary judgment on this element is not appropriate.

3. Discrimination

Discrimination, for purposes of the ADA, can include "demotion, transfer, layoff, termination, . . . and rehiring," if any of those acts was motivated by the affected

individual's disability. 29 C.F.R. § 1630.4(a)(1)(ii). Union Pacific makes no argument that Dr. Holland's restrictions did not amount at least to a demotion or a transfer. Moreover, Dr. Holland imposed those restrictions explicitly because of, among other things, Martin's "chronic knee problems requiring the use of knee braces for stability." (ECF No. 35-10 at 3.) Thus, Martin has met his burden as to this last element of his prima facie case, and has in turn satisfied all three elements.

**B.     Legitimate, Nondiscriminatory Reason**

Martin has met his initial burden, so Union Pacific must now come forward with a legitimate, nondiscriminatory reason for the actions it took. Union Pacific argues that Martin could not safely perform his job. (ECF No. 35 at 18–20.) The Court agrees that this could be a legitimate, nondiscriminatory reason to forbid Martin from working as a switchman.

**C.     Pretext**

The burden thus returns to Martin to present evidence from which a jury could conclude that concern for safety was a pretext, and that Union Pacific's actual motivation was Martin's disability, even though it did not prevent him from safely performing the duties of a switchman. For all the reasons explained in Part III.A.2, above, regarding qualification for the job, Martin has presented evidence from which a jury could find that Union Pacific's explanation is pretextual.

**D.     Failure to Accommodate**

In a separate section of its brief, Union Pacific claims that Martin cannot prove a failure-to-accommodate claim. (ECF No. 35 at 21–22.) Under such a claim, a plaintiff's burden at summary judgment is to come forward with evidence that he or she is disabled yet qualified for the job, and that he or she requested "a plausibly reasonable

accommodation." *Sanchez*, 695 F.3d at 1177.

The analysis above already establishes disability and qualification. Moreover, Union Pacific does not argue that knee braces are an unreasonable accommodation. Rather, it points to its own version of the facts, where it asserts that its employees did *not* prohibit Martin from wearing knee braces during his FSE, and that Martin in fact wore his knee braces during the test. (ECF No. 35 at 21.) If a jury accepted that version of the facts—*i.e.*, that Martin demonstrated an inability to safely perform his job even while wearing knee braces—then it may be that Union Pacific could do nothing to accommodate Martin other than change the job description, which is rarely required under the ADA. *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) ("We will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity. . . . [T]he essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards." (internal quotation marks and citation omitted)).

Martin, however, has raised a genuine issue of material fact over whether he was permitted to wear his knee braces, and whether he actually wore them during his FSE. Thus, the factual linchpin of Union Pacific's argument cannot be established as a matter of law. The jury must decide whose evidence to believe on this matter.

\* \* \*

In sum, judgment as a matter of law for Union Pacific is inappropriate.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Union Pacific's Motion for Summary Judgment (ECF No. 35) is DENIED; and

2. The parties shall jointly contact the chambers of U.S. Magistrate Judge Gordon P. Gallagher no later than **June 8, 2018** to begin the process of preparing a final pretrial order and scheduling the final pretrial conference.

Dated this 5th day of June, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge